IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO: 10-23244-CIV-UNGARO/SIMONTON

ROGER CHAVEZ,

CHAVEZ,

v.

MERCANTIL COMMERCEBANK, N.A.,

Defendant.
_______________________________________/

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR PROTECTIVE ORDER**

PLAINTIFF ROGER CHAVEZ ("CHAVEZ"), by and through his undersigned counsel, hereby serves his opposition to the motion by Defendant MERCANTIL COMMERCEBANK, N.A., ("MCB") for an order prohibiting CHAVEZ from deposing the person at MCB with the most knowledge of the internal investigation of the unauthorized wire transfer from the funds in the account of CHAVEZ.

**INTRODUCTION**

1. In this action, CHAVEZ seeks to recover an unauthorized wire transfer from his account at MCB in the amount of $329,500. MCB has refused to credit the account for the loss. According to MCB, because its internal investigation determined that CHAVEZ was involved in the unauthorized transfer, the claim has been denied.

2. MCB has asserted a blanket privilege against the deposition of the person with the most knowledge of the internal investigation and the documents and information obtained and report generated in the course of that investigation. MCB, however, cannot justify a protective order to preclude the desired discovery. This court should deny the protective order for the following reasons: (1) MCB has waived

the privilege (if any) then existing, by disclosing intentionally, knowingly, voluntarily, and selectively through its in house counsel (Mariola Sanchez) not only the results of the investigation but also produced and delivered to counsel for CHAVEZ documents that supported the internal investigative conclusion that Chavez authorized the transaction; and (2) no privilege applies to any documents or information generated prior to April 29, 2008.

3. CHAVEZ has also produced persuasive evidence demonstrating that the unauthorized wire transfer and theft of his funds were orchestrated by one or more bank employees. Yet, MCB seeks to suppress relevant nonprivileged information and/or documents relevant to same.

Accordingly, the motion for protective order should be denied.

## FACTUAL BACKGROUND

### A. The Unauthorized Wire Transfer

4. MCB claims that on February 6, 2008, CHAVEZ went to the Doral branch of MCB and executed a wire transfer request form. See MCB's Answer to Amended Complaint at paragraphs 4 and 15. (D.E. 9).

5. A copy of the wire transfer request form is attached hereto as Exhibit "A".

6. CHAVEZ has denied that he was at the bank on that day and that he signed the request form.

7. On February 7, 2008, MCB processed the transfer of funds by wire ("Subject Wire Transfer"). See paragraph 4 of MCB's Answer to Amended Complaint (D.E. 9).

8. On April 14, 2008, CHAVEZ called and notified MCB that he did not recognize the Subject Wire Transfer. See paragraph 2 of the Declaration of Mariola T. Sanchez ("Sanchez Affidavit") submitted in support of MCB's motion (D.E. 11).

9. After the phone call from CHAVEZ, MCB commenced an internal investigation into the transaction. See paragraph 2 of the Sanchez Affidavit (D.E. 11).

10. By letter dated April 29, 2008, counsel for CHAVEZ wrote to MCB demanding that CHAVEZ's account be credited. The letter threatened litigation if the account was not credited by May 2, 2008. See letter dated April 29, 2008, attached as Exhibit "A" to the Sanchez Affidavit (D.E. 11).

11. MCB refused, however, to credit the account.

**B. <u>MCB's Disclosure of Its Investigation Results and Supporting Documentation</u>**

12. On July 16, 2010, Mariola Sanchez, the in house counsel for MCB, sent an email to counsel for CHAVEZ. The email confirmed an earlier conversation with counsel for CHAVEZ in which Ms. Sanchez advised counsel that the bank had conducted an investigation and determined that CHAVEZ "was involved" in effectuating the Subject Wire Transfer. The email, a copy of which is attached hereto as Exhibit "B", stated, in pertinent part, as follows:

> As I discussed with you in a previous conversation, the investigation conducted by our security department determined your client was involved in this transaction. I will send you copies of the supporting documentation so we may discuss this further if you would like.

13. During the earlier phone call referred to in the email Ms. Sanchez orally disclosed to counsel for CHAVEZ the following:

a. that MCB contacted the bank in the Dominican Republic to which the wired funds were sent and that the funds were credited to the account of the recipient identified in the wire transfer form (which is Ms. Campillo),

b. that the officer of the Dominican bank contacted the customer for an explanation of the transaction,

c. that the customer explained that CHAVEZ sent the funds to pay for the purchase price of realty in the Dominican Republic,

d. that the customer provided certain documents to evidence the purchase of the land, and

e. that the Dominican bank officer sent to MCB a copy of those documents.

According to Ms. Sanchez, these documents proved the involvement of CHAVEZ in the transaction. See Affidavit of Carlos A. Romero, Jr. attached hereto as Exhibit C".

14. Shortly thereafter, the administrative assistant of Ms. Sanchez kept her word and emailed to counsel for CHAVEZ the supporting documentation (hereinafter collectively referred to as the "Investigative Documents"). See email dated August 5, 2010 and accompanying Investigative Documents attached hereto as Exhibit "D".

15. The Investigative Documents include the following items:

a. A sales contract in which a certain Roger Chavez (the buyer) acquires realty located in the Dominican Republic from a certain Rafael Ruiz (the seller) for $329,500. The sales contract reflects the signatures of both parties acknowledged by and in the presence of a certain notary public in the Dominican Republic on February 5, 2008.

b. A copy of a U.S. passport for the seller, Rafael Ruiz. The passport displays a date of birth of February 27, 1932, and his Dominican descent.

c. Other documentation purportedly relating to the alleged deal. This documentation includes a stamp of a notary on copies of the passport of CHAVEZ and his business card.

16. MCB intentionally, knowingly, and voluntarily disclosed information and documents most favorable to MCB with a view to dissuade CHAVEZ and his counsel from pursuing his claim.

**C. MCB's Investigation is Quickly Discredited by CHAVEZ**

17. CHAVEZ, shortly after receiving the Investigative Documents, obtained information and documents that discredited the MCB investigation and Investigative Documents.

18. CHAVEZ produced to MCB proof that the real property in the Dominican Republic was never sold or transferred to CHAVEZ. Mr. Rafael Ruiz was then and still is the record owner of the realty. See Exhibit "E" attached hereto.

19. CHAVEZ produced to MCB proof that Mr. Ruiz died on September 24, 2004, more than three years before he had purportedly executed the sales contract in the presence of a notary in the Dominican Republic in February 2008. See death certificate for Rafael Ruiz, of Dominican descent and with a date of birth of February 27, 1932, attached hereto as Exhibit "F".

20. CHAVEZ also produced to MCB proof that the notary who purportedly notarized in the Dominican Republic the signatures of both Mr. Ruiz and Mr. CHAVEZ in 2008, died four years before she had purportedly notarized the sales agreement and the signatures of the buyer and seller. See duly authenticated death certificate for Luz Neftis Duquela Martinez, attached hereto as Exhibit "G".

21. CHAVEZ provided MCB with a letter from the Venezuelan airline, Aeropostal, showing that Mr. CHAVEZ was on a flight from Miami to Caracas on the morning of February 6, 2008 (Exhibit "H").

22. CHAVEZ also produced to MCB a copy of his passport showing that he passed through customs in Venezuela on February 6, 2008. The passport also evidences that he has not been in the Dominican Republic. See Exhibit "I".

23. During the course of this litigation, MCB subpoenaed the records of Budget Rent A Car. The Budget Rent A Car records shows that CHAVEZ returned his

rental vehicle to the rental location at Miami International Airport at 6:40 AM on February 6, 2008. This is well before the Doral branch of MCB opens its doors to the public. See Exhibit "J".

24. MCB's receipt of the foregoing evidence has not, however, caused it to reconsider its position and recredit its long time customer's account. To the contrary, MCB has "dug in its heels" and has sought to stonewall any meaningful discovery demanded by Plaintiff.

**D. Evidence of An Inside Job at MCB**

25. The foregoing shows that someone went to great lengths to falsely implicate CHAVEZ in the purchase of property in the Dominican Republic. This would demonstrate to an objective observer that CHAVEZ did not, in fact, execute the wire transfer form and was not involved in the Subject Wire Transfer. Persons who commit fraud create phony paper trails with a view towards leading investigators away from themselves - not phony paper trails implicating themselves.

26. Among the Investigative Documents, one document, moreover, demonstrates that the theft must have been an "inside job".

27. On February 4, 2008 (3 days before the subject wire transfer), CHAVEZ deposited $20,000 in cash at MCB. Pursuant to federal law, MCB prepared a currency transaction report for the deposit, a copy of which is attached hereto as Exhibit "K".

28. In connection with that $20,000 deposit Mr. CHAVEZ presented to MCB proof of his identity. The proof consisted of a copy of his passport and his business card from his company Constructora Rean, C.A. An employee of MCB then made a copy of two pages from Mr. CHAVEZ' passport and his business card on a single page. The business card was laid just below the passport on the face of the copy machine. This one page copy was then placed in the bank's file with a handwritten notation as

to the amount of the deposit and a copy of the account number. This page did not have any other markings. A copy of this single page produced by MCB is attached hereto as Exhibit "L".

29. Among the Investigative Documents, MCB delivered a single page that is identical (excluding the bank notations by hand) to the same single page that appears in the bank files. A comparison of these two pages shows that each contains the exact same two pages from the CHAVEZ passport and the exact same CHAVEZ business card in the exact same position (one below the other). There is, however, one difference. The single page delivered among the Investigative Documents contains and reflects the notary stamp of the dead notary, Luz Neftis Duquela Martinez. See Exhibit "M". The single page in the bank file does not contain or reflect this notary stamp.

30. The only way in which this single page in the bank file could have ended up in the hands of the Dominican bank (which delivered this same single page with the notary stamp) would be as follows: (1) the page was first sent by someone at MCB to an accomplice in the Dominican Republic, (2) subsequently the notary stamp was affixed to it, and (3) Ms. Campillo delivered to the Dominican bank officer a copy of the Investigative Documents for delivery to MCB. Only a dishonest employee at the bank could have access to the bank files and customer records.

## LEGAL ARGUMENT

31. As will hereinafter be demonstrated, because MCB selectively, voluntarily, and intentionally disclosed the results of its investigation and the Investigative Documents, MCB cannot now suppress the remaining undisclosed portions of that investigation. In addition, MCB cannot meet its burden of establishing the existence of any privilege prior to April 29, 2008. The motion for protective order should, therefore, be denied in its entirety.

**POINT I**

**MCB HAS WAIVED ANY CLAIM OF PRIVILEGE BY THE INTENTIONAL AND SELECTIVE DISCLOSURE OF PRIVILEGED MATERIAL**

32. The law has long been settled that the partial disclosure of privileged information and/or material constitutes a waiver of the privilege. "Waiver includes not merely words or conduct expressing an intention to relinquish a known right, but conduct, such as partial disclosure, that would make it unfair for the client to insist on the privilege thereafter." *McClary v. Walsh*, 202 F.R.D. 286, 292 (N.D. Ala. 2000).

33. Waiver in such circumstances is based on two general principles. First, only confidential materials are protected by privilege. Second, a party should not be allowed to exploit selective disclosures for tactical advantages. *Bramlette v. Hyundai Motor Company*, 1993 WL 338980 (N.D. Ill. 1993).

34. The rationale for the rule was explained by the court *In re Consolidated Litigation Concerning International Harvester's Disposition of Wisconsin Steel*, 666 F. Supp. 1148, 1153 (N.D. Ill. 1987) as follows:

> "…a party cannot selectively divulge privileged information without impairing its attorney-client privilege as to the rest of that information concerning the same subject…The privilege exists in the first instance to encourage communication from a client to his attorney, and for that reason the confidence of such communications must be protected…Protection of the opinions given by attorneys to their clients gives rise to similar benefits, and consequently has been treated as part of the privilege…Once a party abandons this confidence by submitting privileged material in the discovery proceeding, the rationale of the privilege is dissipated, insofar as the subject matter of the disclosure is concerned.
>
> …In some instances, a tactical advantage of a limited disclosure may be readily apparent, and equity stridently counsels a finding that the privilege has been

> waived…Partial disclosure, however, always creates the possibility of abuse at a time when the confidentiality of the relationship has been compromised by the very party who wishes to assert it later….Whenever a party discloses information which it could have withheld on the basis of privilege, an implicit determination of benefit has been made by the party, through its attorney. Since the rationale of the confidence is at the same time obviated, no purpose would be served by a court's consideration of the tactical consequences of partial disclosure."

35. See also Tribune Co. v. Purcigliotti, 1997 W.L. 10924 (S.D.N.Y. 1997) at *5:

> Privileges may also be waived when invoked in some fundamentally unfair way. Typically, this occurs where a litigant makes selective use of privileged materials, for example, by releasing only those portions of the material that are favorable to his position, while withholding unfavorable portions. *Nobles*, 422 U.S. at 239-40 (work product waiver); *Von Bulow*, 828 F. 2d at 101-03 (citing cases) (attorney-client privilege waiver); *In re John Doe Corp.*, 675 F.2d at 489 (work product waiver); *Bank Brussels Lambert*, 1995 WL 598971, at **5-6; *Carte Blanche*, 130 F.R.D. at 33 ("The 'fairness doctrine' requires that testimony as to part of a privileged [attorney-client] communication, in fairness, requires production of the remainder.")

36. In the case at bar MCB intentionally and selectively (a) chose to disclose the results of its investigation to counsel for CHAVEZ and, (b) provided to counsel for CHAVEZ a portion of the investigative material, i.e. the Investigative Documents and related information.

37. Having made a partial and substantive release of its investigative report and documents, MCB has waived any claim of attorney/client or work product privileges that might otherwise apply. As a matter of fundamental fairness, CHAVEZ should, therefore, be entitled to depose MCB's investigator and review all of MCB's investigation reports and materials. The motion for protective order should, therefore, be denied in its entirety.

**POINT II**

**MCB CANNOT ESTABLISH THE EXISTENCE OF ANY PRIVILEGE PRIOR TO APRIL 29, 2008**

38. MCB acknowledges that on April 14, 2008 it received a phone call from Mr. CHAVEZ in which Mr. CHAVEZ indicated he did not recognize the subject wire transfer.

39. MCB claims that based on this simple phone call that it immediately "anticipated litigation" so as to cloak every action taken from that point forward with immunity from disclosure under either the attorney/client and/or work product privilege.

40. MCB's position is meritless.

41. The law is well settled that the party asserting a privilege has the burden of establishing its application. See *Place St. Michel, Inc. v. Travelers Property Casualty Company of America*, 2007 W.L. 1059561 (S.D. Fla. 2007) at *3:

> [T]he burden is always on the party withholding discovery to show the documents should be afforded immunity. *See Guidry*, 2003 WL 22038377 at *3; *see also Auto Owners Ins. Co. v. Totaltape, Inc.*, 135 F.R.D. 199, 201 (M.D.Fla. 1990). Moreover, "[t]he mere conclusory assertion that material sought is covered by ... work product privilege is not sufficient to render such material undiscoverable." *Ameritrust Co., N.A. v. White*, Civ. No. 1:90-CV-2691-JEC, 1993 WL 819124, *3 (N.E.Ga. Oct. 20, 1993). Rather, the onus is on the party claiming immunity to provide competent evidence that the materials in question were created in anticipation of litigation.

42. Here MCB has wholly failed to meet its burden of proving that there was any reason to anticipate litigation prior to April 29, 2008.

43. Banks investigate claims of unauthorized wire transfers in the regular and ordinary course of their business. In fact, Official Comment 5 to F.S. §670.203 (which governs wire transfers) explains that in cases involving claims of unauthorized

wire transfers not only are bank investigations conducted as a matter of course but, in addition, the customer is entitled to any evidence developed in the course of such investigations. Official Comment 5 provides:

> Because of bank regulation requirements, in this kind of case there will always be a criminal investigation as well as an internal investigation of the bank to determine the probable explanation for the breach of security. Because a funds transfer fraud usually will involve a very large amount of money, both the criminal investigation and the internal investigation are likely to be thorough. In some cases there may be an investigation by bank examiners as well. Frequently, these investigations will develop evidence of who is at fault and the cause of the loss. The customer will have access to evidence developed in these investigations and that evidence can be used by the customer in meeting its burden of proof.

See also *S.E.C. v. Microtune, Inc*., 258 F.R.D. 310, 318 (N.D. Tex. 2009):

> As the advisory committee notes to Rule 26(b)(3) make clear, "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision." FED. R. CIV. P. 26, adv. comm. notes; see also *El Paso Co.*, 682 F. 2d at 542. Among the factors relevant to determining the primary motivation for creating a document are "the retention of counsel and his involvement in the generation of the document and whether it was a routine practice to prepare that type of document or whether the document was instead prepared in response to a particular circumstance." *Navigant Consulting*, 220 F.R.D. at 477, quoting *Electronic Data Systems Corp. v. Steingraber*, No. 4-02-CV-225, 2003 WL 216513414 at *5 (E.D.Tex Jul. 9, 2003). If the document would have been created without regard to whether litigation was expected to ensue, it was made in the ordinary course of business and not in anticipation of litigation."

44. Bank investigations of this type are analogous to insurance investigations. In that context courts have made clear that simply because an investigation occurs before a suit if filed does not mean that it was done because of the

prospect of litigation. See *Palmer v. Westfield Insurance Company*, 2006 W.L. 2612168 (M.D. Fla. 2006) at *3:

> With respect to documents generated incident to a fire insurance claim, documents that arise out of a routine claim investigation are not subject to the work-product privilege. However, documents that are generated by a fire insurer after a fire has become suspicious and the matter has been referred to a special investigation unit are prepared in anticipation of litigation and, thus, are subject to the work-product privilege. "Simply because an investigation occurs before a suit is filed does not mean that it was not done because of the prospect of litigation."

45. MCB has failed to come forward with any evidence (other than the self-serving conclusory affidavit of Ms. Sanchez) that it had any reason to anticipate litigation in this matter based simply on a phone call from a customer that it did not recognize a debit on his account statement.

46. Since the Sanchez Affidavit is devoid of any facts demonstrating that the investigation commenced following the CHAVEZ phone call was not part of the regular and customary business of the bank, MCB cannot meet its burden of proving that the investigation is privileged.[1]

47. By reason of the foregoing there is no basis for upholding any claim of privilege prior to April 29, 2008. In the event, however, that the Court is unwilling to find that all documents and information generated prior to April 29, 2008 are not privileged, Plaintiff respectfully requests the Court review any documents in dispute in camera.

---

[1] Even if some or all of the investigation was privileged, CHAVEZ would still be entitled to factual information developed during the course of same. See *In re Bank One Securities Litigation*, 209 F.R.D. 418, 423 (N.D. Ill. 2002) ("factual information may not be withheld under the work-product doctrine but must be produced through interrogatories, deposition or other discovery").

WHEREFORE CHAVEZ ROGER CHAVEZ respectfully requests that the Court deny the Defendant MERCANTIL COMMERCEBANK, N.A.'s motion for protective order together with such other and further relief as to the court may seem just and proper.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 22, 2010, I electronically filed the foregoing documents with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served on this day on all counsel of record on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

By: s/ Robert G. Post______________
ROBERT G. POST, ESQ.
Florida Bar No: 0789909
**POST & ROMERO**
3195 Ponce de Leon Blvd.
Suite 400
Coral Gables, Florida 33134
Telephone: (305) 445-0014
Facsimile: (305) 445-6872
rgp@postandromero.com
Counsel for CHAVEZ
ROGER CHAVEZ

**SERVICE LIST**
CASE NO: 10-23244-CIV-UNGARO/SIMONTON
UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA

David S. Garbett, Esq.
Garbett, Stiphany, Allen & Roza, P.A.
Counsel for Defendant
MERCANTIL COMMERCEBANK, N.A.
Brickell Bayview Centre, Suite 3100
80 SW 8th Street
Miami, Florida 33130
Telephone: (305) 536-8861
Facsimile: (305) 579-4722
dgarbett@lbgslaw.com