**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 10-23244-CIV-TORRES

CONSENT CASE

ROGER CHAVEZ,

      Plaintiff,

v.

MERCANTIL COMMERCEBANK, N.A.,

      Defendant.

_____/

**FINAL JUDGMENT AND**
**<ins>FINDINGS OF FACT AND CONCLUSIONS OF LAW</ins>**

This matter is before the Court following a multi-day bench trial conducted in this action.  Plaintiff Roger Chavez filed the original complaint in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida on August 6, 2010.  Defendant, Mercantil Commercebank, N.A. properly removed this action to the United States District Court for the Southern District of Florida on September 8, 2010.  On April 14, 2011, pursuant to 28 U.S.C. § 636(c), the parties consented to the jurisdiction  of the undersigned United States Magistrate Judge for all further proceedings, including trial and entry of final judgment.  Based on the following Findings of Fact and Conclusions of Law, Judgment is entered in favor of Plaintiff Roger Chavez.

## I.   *FINDINGS OF FACT*

### A.   <u>*Background*</u>

1.   Roger Antonio Chavez ("Chavez") was born March 3, 1968.  He is a citizen and resident of Venezuela.  He has lived in Venezuela his entire life and obtained degrees in Mechanical and Automotive Maintenance from a Venezuelan university. He has been married for about 24 years and has two children.

2.   Chavez owns a construction company which specializes in civil works products, such as the drainage of roadways.  Additionally, Chavez owns a farm where he grows oranges, lemons, and sugar cane.  He also owns stock in another Venezuelan sugar cane company and sells livestock.

3.   Mercantil Commercebank, N.A. ("MCB") is a national bank organized and existing under the laws of the United States doing business in Miami.

4.   Chavez opened a money market checking account with MCB in Miami on or about September 25, 2002.  To open this account, Chavez executed a Deposit Agreement and a signature card, signaling his agreement with the terms of MCB's "Understanding Your Deposit Agreement."  Chavez is the only authorized signatory on the account.

5.   Chavez intended to use the account for retirement, protecting his savings from the currency depreciation common in Venezuela.  He also used the account to buy parts for his construction company.  Past wire transfers made from Chavez's MCB account, prior to the transfer at issue, were a $10,000 transfer in 2004 for construction

equipment and transfers of $13,860 and $20,640 to purchase construction equipment on August 17, 2006.

6.      On or about March 7, 2003, Chavez and MCB entered into a Funds Transfer Agreement ("FTA").   The FTA contains terms and conditions for the disbursement of funds by wire transfer from the Chavez Account.

B.      *Chavez's February 2008 Trip to Miami*

1.      *Travel Arrangements*

7.      Chavez, along with his wife, left Venezuela on February 2, 2008. [Exhibit P-9; Chavez Testimony at 23].  He arrived in Miami in the late afternoon on February 2nd, rented a vehicle and stayed in a hotel.  The purpose of this trip was to do personal shopping, purchase items for his construction company, and visit MCB to obtain past account statements that were not received.

8.      On February 6, 2008, Chavez returned his rental car to the Dollar Rent-A-Car location on 25th Street in Miami, Florida at 640 AM. [Exhibit P-10].  He waited at the Miami International Airport until his flight departed and arrived in Venezuela later that day. [Exhibit P-9; Chavez Testimony at 31-32]

9.      A travel itinerary, Exhibit P-8, was provided to Chavez by the Venezuela travel agency Brujula.  The itinerary is consistent with Chavez's recollection that he departed Venezuela aboard Aeropostal Flight No. 502 on February 2, 2008 and returned on Aeropostal Flight No. 501 on February 6, 2008.  It is also consistent with the Dollar Rent-A-Car receipt, Exhibit P-10, which reflects that Chavez's rental car

left the Dollar Rent-A-Car location at 9:15 PM on February 2 and was returned at 6:40 AM on February 6.

### 2.    Visits to MCB on February 4 and 5, 2008

10.    During Chavez's visit to Miami, he made two trips to MCB.

11.    On his first trip, February 4, 2008, Chavez made a $20,000 cash deposit into the Account.  The deposit slip reflects that the deposit was made at 11:03 AM. [Exhibit P-12].  To make this deposit, according to MCB's policies and procedures, Chavez was required to complete a Currency Transaction Report.

12.    Chavez was required to present his passport and a copy of his business card to verify his identity.   The bank made a copy of these documents for its file, but did not provide Chavez with a copy.  Next to the image of his passport and business card are "$20,000," the amount of the transaction, and "8302738312," the account number. [Exhibit P-13].  The Court finds that neither of these were written by Chavez. [Chavez Testimony at 27:12-14].

13.    During this February 4 visit, but after making the cash deposit, Chavez requested that Alejandro Agnati, an MCB customer service representative, print copies of statements that he had not received.  The MCB employee provided Chavez with copies of his account statements for August-December of 2007 and January 2008. [Exhibit P-11].

14.    On February 5, 2008, Chavez again visited MCB's Doral Branch.  At 12:54 PM, he deposited $3,700 into his Account. [Exhibit P-14].  He deposited this extra money because it was left over from the purchases he and his wife had planned

to make in Miami, and he did not wish to bring extra US Dollars to Venezuela. [Chavez Testimony at 30:9-11].

### C.    *The Payment Order*

####    1.    *MCB's General Procedures for Payment Orders*

15.    MCB employees were given training on the proper procedures to accept a wire transfer form or "payment order."  In February 2008, the procedure would include:

- A customer would either bring a completed payment order or be provided with a blank payment order to complete in their own handwriting.

- The customer would be required to include a date, his or her name and account number, the amount of the transfer, the receiving bank's name, location, and Swift Code, the payee's name and account number, and any additional information.  The customer would then sign the payment order and print his or her name below.

- A MCB employee would check the form to make sure it had been properly completed, verify the customer's ID (if he or she did not personally know the customer), verify the signature, verify the account balance, and confirm that a Funds Transfer Agreement was on file.  To confirm that these procedures were completed, a stamp would be placed and initialed near the signature noting its verification, a stamp would be placed on the form and the available balance would be written in, accompanied by the

verifiers name, and the representative would write on the form "F.T.A. on file" to denote that a Funds Transfer Agreement was on file.

- After the initial steps, an officer would receive the form and had to give approval. Approval was noted by a stamp with the officer's name accompanied by his or her signature. The number of officers needed to approve a wire transfer varied based on the amount to be transferred.

16. MCB employees utilized a computer system known as AS400 in order to confirm account balances and ensure that it was sufficient to cover the payment order. The system would also indicate if a FTA was on file. The AS400 system does not permit access to images stored in the bank's file, such as images of a customer's identification. The system tracks and records user log-ins.

17. A customer's signature would be verified by checking the SQN system. The SQN system is MCB's database for signature verification. It displays the signature associated with a customer's account. SQN does not contain or permit access to images, such as images of a customer's complete signature card, identification, or funds transfer agreement. SQN does not generate or keep activity or trace records that would permit MCB to generate a log of user access.

18. During 2008, MCB had a 2:00 PM cut-off time for the processing and execution of payment orders. Customers were also advised that the funds would be wired within 24 to 48 hours of the payment order's completion and submission. Accordingly, verification that the account holder had a sufficient balance, that an FTA

was on file, and approval by officers could be completed after the customer left the bank.

19.    Officers had access to a third system, called InfoImage.  This system displays images of customer information such as signature cards, FTAs, and other images.  Although not required, officers were permitted to use the InfoImage system to conduct an independent review of the payment order.

### 2.    The Subject Payment Order's Creation

20.    The Payment Order at issue, dated February 6, 2008,  provided for the wire transfer of $329,500 from Chavez's MCB Account to the account of a beneficiary at Banco BHD, S.A. in the Dominican Republic.

21.    Rosanna Gutierrez worked as a greeter at MCB.  Her duties were to welcome customers, ask them sign in a log book, and assist customers in obtaining bank statements, checking balances, and wire transfers (also known as payment orders).  She would help customers in person and also could assist customers who called the bank.  As part of her training, she was instructed on the proper methods to accept these wire transfers.  The procedures are the same as outlined above.

22.    Gutierrez was the MCB employee who accepted the subject payment order.

23.    Surveillance video that would have shown Gutierrez accepting the payment order on either February 5 or 6, 2008 was not captured.  The Court draws no inference against MCB for the absence of any surveillance footage that should have, ostensibly, corroborated MCB's version of the events.

24.     Gutierrez does not specifically recall accepting the subject payment order and cannot identify the person who provided it to her.  Her testimony regarding the acceptance of the payment order is based on the general practices and procedures of what she would normally do, as required by MCB policy.

25.     Bank policy does not require an employee to make a copy of a customer's identification before receiving a payment order.

26.     Gutierrez wrote "F.T.A. on File" signifying that a Funds Transfer Agreement was on file with the bank.  She also placed a stamp on the form and initialed the stamp, confirming she had verified the signature purporting to be Roger Chavez.  Gutierrez also placed a stamp on the Payment Order and hand wrote the available balance of the Chavez account before the wire transfer.

27.     Gutierrez accessed the AS400 system to view Mr. Chavez's account at 9:52, 9:53, and 9:57 on the morning of February 6. [Exhibit P-44].  Chavez was not at the Doral branch of MCB in the morning of February 6.  However, the bank had a common practice to examine the account balance on the date that the wire transfer was going to be processed, which was not always the day that the payment order was received. [Gutierrez Testimony at 136:4-13].

28.     Gutierrez, or someone using her AS400 account, also accessed Chavez's account information on February 1, 2008.  Chavez was in Venezuela at the time. Gutierrez would, after confirming a customer's identity by telephone, access their account to provide his or her account balance.  However, Chavez's telephone records do not show a call to MCB on February 1 and he credibly denies making such a call.

It is more likely than not that Chavez did not call MCB to get his account balance on February 1.

29.     The amount of the Payment Order, $329,500, required the approval of two officers.  Talia Pina, an Operations Manager at MCB in Doral, stamped and signed the Payment Order, signaling that the order was properly completed and that she checked the available balance and signature.  Ms. Pina could, and more likely than not did, review a print out from the AS400 provided by Ms. Gutierrez to confirm the account balance. [Pina Testimony at 143:8].  Ms. Pina was not required to verify the customer's identification because she would rely on the training of Gutierrez, the greeter, to do so. Lolita Peroza was the second officer to stamp and approve the Payment Order with her signature.

30.      Gutierrez left work at 2:05 PM on February 6, so she did not have an opportunity to fax the Payment Order to MCB's wire department on that day.  Instead, it was sent the following morning, February 7, 2008 at 10:15 AM.

31.     On February 7, 2008 at 1:16 PM, MCB sent an outgoing payment order through Fedwire to Bank of America as intermediary bank, as instructed by the Payment Order, debiting Mr. Chavez's account. The beneficiary of this transfer was Nilda Margarita Fernandez-Campillo in Santo Domingo, Dominican Republic.  The bank receiving the funds was Banco BHD, S.A., also in the Dominican Republic. [Exhibit D-18].

### D.   *Forensic Document Analysis of the Payment Order*

#### 1.  *Plaintiff's Expert*

32.    Plaintiff's expert Charles L. Haywood has worked as a Forensic Document Examiner for approximately 26 years.  He currently owns and operates Haywood Forensic Document Examination, LLC.  He has operated that company for the past 11 years.

33.    Beginning in 1981, he was employed as a Special Agent with the Federal Bureau of Investigation, spending 15 years at the FBI laboratory.  While at the FBI, he completed a two-year training program for Forensic Document Examiners and worked as a Forensic Document Examiner with the FBI for 13 of his 15 years.

34.    The FBI Laboratory certification program, which Haywood completed in 1983, includes formal class instruction, reading and research assignments, practical exercises, and field work under the guidance and supervision of experienced and qualified examiners.  Instruction is given by FBI Special Agents as well as experts from the Smithsonian Institute, Bureau of Engraving and Printing, and the Library of Congress.  At the end of the two-year training program, each examiner trainee undergoes a series of tests regarding examination of documents and being examined on his or her findings in a moot court.  Haywood completed these exercises.  He was recommended for, and received, FBI approval as a forensic document examiner.

35.    While at the FBI laboratory in Washington D.C., Haywood was responsible for training new examiners, testified in approximately 100 cases, and was

responsible for the examination and comparison of handwriting, typewriting, printing, copying, and alterations of questioned documents.

36.     Haywood obtained a Bachelor of Science degree in Criminal Justice from Georgia State University in 1975.  While working for the FBI in Washington, D.C., Haywood obtained a Master of Forensic Science degree from the George Washington University in 1987.

37.     He left the FBI Laboratory in Washington D.C. in 1996 and was reassigned to the FBI Miami Field Office, where he also worked as a Special Agent in investigative work, including two years as coordinator of the evidence response team. He held that position until 2002, when he began his private practice.

38.     In 2007, Haywood was certified by the American Board of Forensic Document Examiners.  To obtain this certification, applicants must hold a bachelor degree, complete a recognized training program, have two years experience after completion of the training program, and have a record of integrity.  Applicants are subjected to a written test, practical problems, and an oral interview.

39.     Haywood is a Diplomate of the American Board of Forensic Document Examiners (ABFDE), an associate member of the American Academy of Forensic Science (AAFS), and a member of the American Society of Questioned Document Examiners (ASQDE), Southeastern Association for Forensic Document Examination, Florida Division of the International Association for Identification (FDIAI), and the International Association for Identification (IAI).

40. With over 26 years of experience, education, and expertise, Haywood is a highly qualified expert in the field of forensic document examination. The Court received his expert testimony at trial.

## 2. *Defendant's Expert*

41. Defendant's expert, Dianne C. Flores, is a Forensic Document Examiner with Hart Questioned Document Laboratory, Inc. She has worked with the lab since September 2004 as a Forensic Document Examiner. From August 1999 until August 2004, she was a laboratory technician.

42. Ms. Flores obtained an Associates Degree in Science in Legal Assisting and an Associates in Art in Business Administration from Miami Dade Community College in 2002. She received a Bachelor of Science in Business Management from Florida International University in 2005. In 2008, Ms. Flores obtained a Master of Science in Forensic Sciences Administration and a Graduate Certificate in Forensic Examination of Questioned Documents from Oklahoma State University.

43. Ms. Flores has been trained by Ms. Linda Hart, a well known and respected forensic examiner, since 1999. During this time, she assisted Ms. Hart in the examination of documents, preparation of comparison charts, processing documents in the laboratory, and office work. She was officially trained beginning in 2004 and underwent a two-year training in the examination of questioned documents, including signatures, printed writing, cursive writing, inks, typewritten documents, and other topics. This training was completed in 2006.

44.    Ms. Flores is a Certified Forensic Consultant with the American College of Forensic Examiners Institute, an Associate Member of the American Academy of Forensic Sciences (AAFS) and Association of Forensic Document Examiners (AFDE), and a member of the American Society for Testing and Materials (ASTM), the Southeastern Association of Forensic Document Examiners (SAFDE), and the Association of Certified Fraud Examiners (ACFE).  She has attended numerous professional meetings and trainings.

45.    Ms. Flores first testified in Florida state court in February of 2007**.**  Since then, she has testified numerous times, including in the Southern District of Florida.

46.    Ms. Flores has started the certification process with the Board of Forensic Document Examiners.  She has passed the two-year training and practical portion, but has yet to complete a computerized test.

47.    When Ms. Flores is required to present letters of recommendation from Certified Document Examiners to an association, she uses the recommendations of Linda Hart and Charles Haywood.

48.    Like Haywood, Ms. Flores is also a qualified expert in the field of Forensic Document Examination.  The Court also received and considered her expert testimony at trial.

49.    Both Haywood and Ms. Flores conducted an examination of the Payment Order, Exhibit D-1.  The process each expert used to analyze the document was similar.  The writing is first examined to determine if it was naturally and freely executed in order to determine if it could be compared with Chavez's known writing

samples.   The sample writings were also examined to determine if they were comparable to the disputed writing in wording or letter combination, and if they were naturally and freely executed.   Next, a side-by-side comparison of the disputed writing with the sample writing was conducted.   The experts compared portions of the known sample to the disputed writing to determine if the two show similarities or divergences. Each expert made a determination if fundamental or significant differences existed in the writing.

50.    Document examiners indicate their degree of certainty on a continuum, which is generally as follows, in order of strongest identification to strongest elimination:

- Definitive Statement of Identification, meaning that the writer of the sample document was the writer of the questioned document
- Highly (or very) probable identification
- Probably written by the same person
- Inconclusive
- May have been written by another person
- Highly probably written by another person
- Definitive statement of elimination, meaning that the writer of the sample document was not the writer of the questioned document.

51.    After completing his examination, Haywood reached the conclusion that the writing and signature on the Payment Order was not that of Mr. Chavez.   He reached a definitive statement of elimination, without qualification. [Exhibit P-42].

52.    Ms. Flores reached the conclusion that Chavez "very probably" filled out the Payment Order and signed the document. [Exhibit D-23; Flores Transcript at 31:15-17].

### 3.  *Reconciling Competing Expert Opinions*

53.    Focusing on the record as a whole, the Court finds that it is more likely than not that Chavez did not sign the Payment Order.  The Court finds more credible and persuasive the testimony of the Plaintiff's forensic examiner, his analysis and reasoning supporting that analysis, together with the supporting materials in the record that he relied upon.

54.    Specifically, the Court finds that, while there are pictorial similarities between the handwritten signature on the payment order and the various specimens that the examiners reviewed, there were too many fundamental differences observed in letter formations and beginning and terminal strokes.  The Court in particular found Haywood's explanation and description of those fundamental differences quite persuasive.  By contrast, though Ms. Flores's testimony was equally impressive and credible, her explanations and her efforts to discount those fundamental differences identified by Haywood simply lacked persuasive support in light of the relevant record.

55.    For instance, Ms. Flores's explanation for why the middle letter "A" was formed on the payment order in such a unique way from almost all of the comparison specimens located with Chavez's signature fell flat.  This is but one example, of course, for why Haywood's testimony was more persuasive.  But the strength of his testimony was in his collective examination of all the relevant factors, in accordance with the

accepted practices in this field, which pointed in favor of a definitive determination that Mr. Chavez, more likely than not, did not sign the payment order at issue.

56.     As a further example, Ms. Flores placed significance on the extended hand printing on the Payment Order, noting in her report that "the form does not indicate that it must be filled in by an account holder.  That is, anyone could have completed the questioned document without raising any suspicions, yet the same person appears to have very probably filled out and signed the document." [Exhibit D-23 (June 2, 2011 Report) at 7].   Her statement reflects the belief that a forger would not need to simulate Chavez's writing on the form, except for the signature, and it was therefore significant to her that the extended writing appeared similar to Chavez's and appeared to be completed by the same person.

57.     The Court finds, however, that this assumption is contradicted by Defendant's own evidence.  Ms. Gutierrez stated she would never fill out a wire transfer request form on behalf of a customer. [Gutierrez Testimony at 111:20].  Ms. Pina confirmed that the customer would complete and sign the payment order. [Pina Testimony at 140:18].  The significance Ms. Flores placed on this factor was based on an incorrect assumption that the same person need not complete the entire form.

58.     Moreover, the Court must consider the record as a whole in adjudicating the factual question.  The disputed forensic examinations are but one part of that record.  In carefully evaluating that supporting record in the intervening period since the end of the trial, the Court consistently reached the conclusion that the most persuasive direct and circumstantial evidence all pointed in favor of a finding that Chavez did not sign the payment order.  Someone else, either one formerly affiliated

with MCB or some other unknown person, more likely than not forged his signature to defraud Chavez and MCB.  If nothing else, the Court can rely upon the credibility of Chavez himself.  The Court's careful evaluation of his testimony yielded but one result: that he was fully credible in his denial that he had authorized that wire transfer.  The Court can, of course, rely entirely on its credibility determination as to Chavez's testimony.  He did not sign that payment order.  But apart from that, the overwhelming weight of all the evidence presented, both direct and circumstantial, point in Chavez's favor and satisfies his burden of persuasion.

### *E.*    ***Chavez's Notice to the Bank***

59.    After his February 5, 2008 cash deposit into his MCB account, Chavez made no further deposits in February, March, or April of 2008.  He similarly did not write any checks on that account or initiate any wire transfers during those months.

60.    Chavez claims that he did not receive a February or March bank statement from MCB in Venezuela.  Although he had notified the MCB customer service representative in Miami on February 4th that he had not been receiving statements, the issue was not immediately corrected according to him.

61.    In 2008, the statement period for Chavez's account closed in the middle of each month.  Chavez's account statement for February 2008 closed on February 18, 2008.  In 2008, within not more than one or two days of the statement closing period, MCB would print the bank statements, which would then be mailed to the address Chavez provided MCB for correspondence: 4th Ave. con Calle 13, Edf. Capoi Piso 3, Ofc

3-3, San Felipe, Yaracuy, Venezuela. There is no dispute that this was his mailing address at the relevant time.

62.    The February 18, 2008 monthly statement, which covered debits made on February 7, 2008, showed the Payment Order and resulting debit of Chavez's account. Chavez did not notify the bank of any problem with that statement within fourteen days of this date.  Chavez's testimony that he did not actually see his statements was credible.

63.    Though he claims he did not review the written statement, Chavez was able to check the total balance of his MCB bank account on line by going to the website of Banco Mercantil in Venezuela.  Chavez did not review his account during this period.

64.    On April 14, 2008, Chavez was planning a trip to Miami to purchase spare parts for his construction equipment.  He routinely reviews the status of his account online before making trips to Miami.  He noticed, while checking his account on April 14, 2008, that there was money missing. [Chavez Testimony at 34:9-15].

65.    Within approximately five minutes of noticing that money was missing from his MCB account, Chavez contacted Jesus Diaz, a MCB employee, to inquire about the $329,500.00 debit from his account. [Exhibit P-15].

66.    After several attempts to reach her, Chavez was finally able to discuss the issue with Anna Stefanelli, an account manager at MCB.  Chavez retained the services of Squire, Sanders, & Dempsey, LLP to represent him in his communication with the bank regarding the alleged fraud on his account.  On April 21, Raul Manon, Chavez's

attorney, was informed by Ms. Stefanelli that the matter was being handled by MCB's antifraud department. [Exhibit P-15].

67. Chavez visited MCB in April of 2008, but the bank did not agree to re-credit his account for the $329,500 debit.

68. On April 29, 2008, Mr. Manon sent a letter to Ms. Mariola Sanchez, General Counsel to MCB, regarding Chavez's attempts to have the bank re-credit his account. [Exhibit P-15]. After receiving this letter, the bank denied Chavez's claim for a refund.

69. In support of the denial of Chavez's claim, MCB provided materials regarding a land purchase in the Dominican Republic. [Exhibits P-21; P-22]. The materials were received from a representative of Banco BHD, S.A., a Dominican bank, during the course of MCB's investigation.[1]  The materials include:

---

[1] During the trial, the Court heard argument and received trial briefs regarding the admissibility of Plaintiff's Exhibits 26 and 27. Exhibit P-26 is a "Death Record" from the Dominican Republic and includes the "Extracto de Acta de Defuncion" written in Spanish, its translation, and an Apostille that attests to the validity of the translator's signature, but not the signature of Ynda Yudelka Martinez Nunez, the officer whose signature appears on the original document. Exhibit P-27 is a Certificate of Title from the Dominican Republic, including the "Certificacion Del Estado Juridico Del Inmueble" in Spanish, its translation into English, and an Apostille attesting again to the validity of the translator's signature.

MCB to these exhibits, claiming that they are not properly authenticated as required by Fed. R. Evid. 902(3) and the Hague Convention Abolishing the Requirement of Legalization of Foreign Public Documents, 1981 WL 375769 (U.S. Treaty). On July 23, 2013, this Court provisionally admitted the documents and overruled the hearsay and relevancy objections, but let the issue of authentication run with the case. *See* Trial Transcript, July 23, 2013, at 20. Having reviewed counsels' arguments and legal authorities, MCB's objection to Plaintiff's Exhibits 26 and 27 for failure to properly authenticate the foreign public documents is Sustained. Exhibits P-26 and P-27 are inadmissible and have not been considered in these Findings of Fact.

- a sales contract reflecting that "Roger Antonio Chavez" purchased land from "Rafael Ruiz" for $329,500.00;

- a United States Passport of Rafael Ruiz;

- a copy of Chavez's Venezuelan Passport and business card, which appears to be the same documents in the same position as Plaintiff's Exhibit 13;

- a copy of Chavez's expired Venezuelan Passport, that appears to be the exact copy of the passport presented to MCB in 2002 when Chavez opened the account.  The document, including the handwritten name "Roger Antonio Chavez" beneath the passport copy, is similar to the image as it appears in the bank's file (which by itself supports suspicions that someone affiliated with the bank may have been involved in some way in the fraudulent scheme);

- a forged letter from February 12, 2006 on what purports to be MCB letterhead regarding the satisfactory status of Chavez's account.   The letterhead is not the letterhead MCB used in 2006 and is a clearly fraudulent document. [Sanchez Testimony at 23:7-15].

70.    Both forensic document experts agree the signature "Roger Chavez" on the sales contract is a forgery. [Sanchez Testimony at 20:2].

71.    A Massachusetts Death Certificate certifies that Rafael Suarez Ruiz died on September 24, 2004, years before the fraudulent land purchase. [Exhibit P-25].  The date of birth on the death certificate matches the date of birth on the United States Passport of Rafael Ruiz presented to MCB during its investigation.

72.     The denial of Chavez's claim was based on MCB's belief that he had in fact signed the payment order. [Sanchez Testimony at 24:15-16].

73.     Chavez was informed by Mariola Sanchez in 2010 that his claim was officially denied.

## II.   CONCLUSIONS OF LAW[2]

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1441(a), and 12 U.S.C. § 632.

### A.

Article 4A, as adopted in Florida, "governs a specialized method of payment referred to in the Article as a funds transfer but also commonly referred to in the commercial community as a wholesale wire transfer." Fla. Stat. § 670.102 cmt.  The article is meant to govern the rights, duties and liabilities of banks and their customers with respect to funds transfers, which may be initiated by a written payment order. *Id.* § 670.103.

Ordinarily, the bank receiving a payment order bears the risk of loss of any unauthorized funds transfer.  Specifically, section 670.204 provides: "(1) If a receiving bank accepts a payment order issued in the name of its customer as sender which is not authorized and not effective as the order of the customer under s. 670.202 or is not enforceable, in whole or in part, against the customer under s. 670.203, the bank shall refund any payment of the payment order received from the customer to the extent the

---

[2]     To the extent that any conclusions of law constitute findings of fact, they are hereby adopted as such.  To the extent any findings of fact constituted conclusions of law, they are also adopted as such.

bank is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund." Fla. Stat. § 670.204.

Section 202 referenced above addresses when a bank can shift the risk of loss to the customer, i.e., the safe-harbor provision.  The bank may shift the risk of loss to the customer by showing one of two things: (1) the "payment order received . . . is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency," *id.* § 670.202(1), or (2) the parties agreed to a security procedure that is commercially reasonable and that the bank followed in good faith, *id.* § 670.202(2).

In the summary judgment motion adjudicated at an earlier stage in the case, the Court found that MCB could rely upon the security procedure in place for Chavez's account that it followed in good faith.  The risk of loss, therefore, shifted to Chavez. [D.E. 106].  The Court of Appeals, however, reversed that judgment and found that the parties' agreed-upon security procedure did not satisfy the requirements of section 670.201; the safe harbor provision in section 202 could thus not apply. [D.E. 147].

On remand, therefore, the only relevant issue was whether the payment order MCB received was in fact authorized by Chavez, thereby negating any liability under sections 670.204(1) and 670.202(1).  The Court has found that Chavez did not in fact authorize this wire payment order, nor is he bound to that order under any law of agency.  Under section 670.204(1), therefore, "the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to

enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund."

Accordingly, at a minimum Chavez is legally entitled to judgment against MCB under Florida law for the full principal amount of the wire transfer – $329,500.00.

## B.

The remaining issue is whether MCB is also bound to refund interest on the refundable amount calculated from the date the bank received payment to the date of the refund. This final question also implicates section 670.204 that obligates a bank customer to report an unauthorized payment order within a reasonable period, not to exceed 90 days, in order to preserve a claim for interest on the principal amount of the payment. The parties may, however, shorten this period by agreement. Specifically, section 670.204(2) provides that a "[r]easonable time under subsection (1) may be fixed by agreement, but the obligation of a receiving bank to refund payment as stated in subsection (1) may not otherwise be varied by agreement." Florida law permits the parties to vary its provisions and define "reasonable time" so long as the variation is not manifestly unreasonable. *Id.* § 671.102(2)(b).

In the Depositor's Agreement, MCB and Chavez modified § 670.204(1) to require Chavez to notify MCB of an allegedly unauthorized payment order within 14 days. Specifically, the Agreement provides, in pertinent part:

> 6. Statement of Account. . . . The Depositor shall exercise reasonable care and promptness in examining each statement of account and shall report to the Bank, within 14 calendar days (60 days for EFT's) after receipt of such statement, any irregularities found therein, including, but not limited to, any unauthorized signatures and alterations. Unless the Depositor notifies the Bank of an irregularity in a statement within 14

days (60 days for EFT's) after receiving it, the Depositor will be deemed to have admitted its correctness and will have waived any right to object to it.

[Exhibit P-4].

That same modification is incorporated into the Funds Transfer Agreement that

provides, in pertinent part:

10.    Notifications/Client's Duty to Report Discrepancies.  The Bank shall mail or deliver to the Client, at the most recent address of the Client reflected in the Bank's records, a confirmation or periodic statement stating the date and amount of each Transfer, and the account to which the Transfer was made. The Client shall examine such notification and advise the Bank within a reasonable period of time, not to exceed fourteen (14) calendar days after the Client receives the confirmation or statement, whichever is received first, of any unauthorized, duplicate, erroneous, or erroneously executed Payment Order.  The Client's failure to timely notify the Bank discharges the Bank of any obligation to pay the Client interest on any principal amount to be refunded to the Client.

[Exhibit P-5].

There is no dispute that the failure to meet the 14-day notice provision results in the loss of interest by the bank customer. [D.E. 156 ¶26].  What is at issue, however, is whether Chavez satisfied that modified notification period.  Chavez argues that he did because he contacted MCB immediately after learning that his account had been improperly debited two months earlier.  Chavez contends that he had no actual notice of that fact prior to April 2008 because he was not receiving monthly written statements during that period and he had not reviewed his online records during that period as well.  Because he did not have actual knowledge, he never violated the 14-day notification period.

We first turn to analyze what Florida law deems to be sufficient notice for purposes of sections 671.102 and 671.204. Article 4 defines "notice" expressly:

(1) Subject to subsection (6), a person has "notice" of a fact if the person:

      (a)    Has actual knowledge of it;

      (b)    Has received a notice or notification of it; or

      (c)    From all the facts and circumstances known to the person at the time in question, has reason to know that it exists.

Fla. Stat. § 671.209(1) ("Notice; knowledge").

This statutory definition of notice further provides:

(4) A person "notifies" or "gives a notice or notification to" another person by taking such steps as may be reasonably required to inform the other person in ordinary course, regardless of whether the other person actually comes to know of it.

(5) Subject to subsection (6), a person "receives" a notice or notification when:

      (a)    It comes to that person's attention; or

      (b)    It is duly delivered in a form reasonable under the circumstances at the place of business through which the contract was made or at another location held out by that person as the place for receipt of such communications.

*Id.* § 671.209(4)-(5).

There is no dispute that for the majority of the time that Chavez maintained his account, MCB had a regular practice of mailing statements. MCB's position is that it followed that regular practice continuously until Chavez's account was closed. The general rule in a variety of contexts is that evidence of a standard practice of mailing raises a presumption of receipt. "The common law has long recognized a rebuttable presumption that an item properly mailed was received by the addressee. The 'presumption of receipt' arises upon proof that the item was properly addressed, had sufficient postage, and was deposited in the mail. The presumption is, of course, rebuttable." *Konst v. Fla. E. Coast Ry. Co.,* 71 F.3d 850, 851 (11th Cir. 1996). This common law presumption may not be rebutted by a mere denial of receipt. *See, e.g., Barnett v. Okeechobee Hosp.,* 283 F.3d 1232, 1239 (11th Cir. 2002) ("[T]he common law has long recognized a rebuttable presumption that an item properly mailed was received by the addressee. . . . As other courts have noted, a party's failure to uncover an item, which it was presumed to have received, does not mean that it never received the item and does not rebut the presumption of delivery."); *In re Farris,* 365 F. App'x 198, 199-200 (11th Cir. 2010) (mere denial of receipt without more insufficient to rebut presumption of receipt); *Rivera v. AT&T Corp.,* 420 F. Supp. 2d 1312, 1320-21 (S.D. Fla. 2006) (plaintiffs' mere denial of receipt of document containing arbitration agreement not sufficient to overcome presumption of receipt through mailing and evidence that mail was not returned).

Here, MCB established its regular practice of mailing statements to the address Chavez provided MCB, and Chavez admitted receiving statements at such an address

before February 2008 and as late as May 2008.  There is no evidence that MCB's uniform and regularly-followed procedure of mailing Chavez his monthly statements was terminated or suspended.  There is no evidence that the statements at issue were returned to the sender during any period of time.  Under the common law rule, therefore, we can presume that Chavez received the statements at his Venezuelan mailing address even though we may find his testimony credible that he never actually saw or read them at the time.

The common law presumption of receipt has not been superseded in this case by statute.  To the contrary, section 671.209(5) supports a finding on these facts that Chavez received notification from MCB as to his account status in February 2008.  This provision sanctions a finding of notice where "[i]t is duly delivered in a form reasonable under the circumstances at the place of business through which the contract was made or at another location held out by that person as the place for receipt of such communications."  That is precisely what we have here because the February statement of account was delivered by mail, which is reasonable under the circumstances, to the location that Chavez identified and agreed to contracted for receipt of communications from MCB.

Relying upon both the common law and the relevant statutory provision, we have a sound basis to conclude that Chavez was "notified" of the wire transfer in February 2008, but did not timely challenge the transaction within the 14-day window he agreed to.

To overcome the legal presumption that he was notified of the transaction, Chavez's denials are insufficient.  Instead, the burden falls on him to show affirmative

proof of non-receipt.  *See, e.g., Barnett,* 283 F.3d at 1240-41 (citing *Bailey v. United States,* 642 F.2d 344, 347 n.1 (9th Cir. 1981) ("[T]he presumption [that the plaintiff's FTCA claim was received], assuming that it exists, [was] rebutted by proof of non-receipt")).  Direct testimony of non-receipt, combined with other evidence, may be sufficient to rebut the presumption.  *Farris,* 365 F. App'x at 200 (citing *In re Prescott,* 285 B.R. 763, 767 (Bankr. S.D. Ga. 2001) ("The presumption of receipt may be rebutted . . . by producing evidence which would 'support a finding of the non-existence of the presumed fact.' "); *In re Hobbs,* 141 B.R. 466, 468 (Bankr. N.D. Ga. 1992)).

Apart from Chavez's denials that he did not actually review any statements in February or March 2008, we have little evidence in the record that shows affirmative proof of non-receipt.  We have no evidence from the bank's records that suggests that the documents were never printed or distributed in the normal course.  We have no evidence that the mailing system in Venezuela was shut down during the relevant period.  We have no evidence that any other mail addressed to Chavez did not make it as well.  We only are left to speculate as to why Chavez did not see his statements.  Certainly, speculation lacking affirmative evidence is not sufficient to overcome the common law and statutory presumptions that support MCB's position, much like Chavez's denials, no matter how credible, are insufficient as well.

This conclusion that Chavez has failed to rebut the presumption of mailing and receipt is reinforced by the fact that Chavez never took the simple steps necessary to receive and view his statements online.  Tellingly, Chavez did go online with MCB's Venezuela affiliate to find his account balance, but this web site did not provide access

to the statements.  If it were true that Chavez's statements were not arriving on a regular basis, one would expect Chavez to sign up for online statements or to review his online balance sooner than he did.  He did not do so.  That only bolsters MCB's position that the 14-day notice provision was not satisfied.

Accordingly, Chavez has failed to rebut the presumption that he received his monthly statements, including the statement for the period ending February 15, 2008, which would have been mailed well before the end of that month, thereby rendering untimely his April 14, 2008 claim that the Payment Order was unauthorized.  Chavez's denials are insufficient to rebut that presumption.  Therefore, Chavez received timely notice of the subject wire for purposes of section 670.204.

This analysis is not without precedent in the Article 4A context.  In *Covina 2000 Ventures Corp. v. Merrill Lynch,* 2008 WL 1821738 (S.D.N.Y. 2008), that district court entered summary judgment for a financial institution on the entire claim of a customer who did not timely report unauthorized payment orders.  The customer denied receipt of various account statements mailed to the customer's address reflecting the debits. But because mere denials were insufficient to rebut the presumption of receipt, the customer was unable to rebut that presumption that he received the monthly statements during the relevant time period. *Id.* at *1, *4 ("In order to rebut the presumption, an intended recipient claiming not to have received the notice must adduce specific evidence that the office procedure was not followed or that the notice was not received.").

For similar reasons, we conclude that Chavez did not satisfy his contractual obligation of providing timely objection to the fraudulent wire transfer.  Under section 670.204(1), this conclusion creates an absolute bar to recovering interest:

> [T]he customer is not entitled to interest from the bank on the amount to be refunded if the customer fails to exercise ordinary care to determine that the order was not authorized by the customer and to notify the bank of the relevant facts within a reasonable time not exceeding 90 days [as modified to 14 days, see discussion above] after the date the customer received notification from the bank that the order was accepted or that the customer's account was debited with respect to the order.

Based on the plain language of this provision, Chavez is statutorily precluded from recovering interest despite satisfying his burden to show that the payment order was unauthorized.  Chavez, however, citing the official comments to § 670.204, contends that if the customer fails to satisfy the duty to report, no interest is recoverable for any part of the period before the bank learns that it accepted an unauthorized order.  In other words, interest would be tolled only through April 2008, when undisputably MCB learned of the claim.

Chavez's position is not unreasonable as a factual matter, nor is it without legal foundation.  But an "'official comment' is only that—a comment.  It has not been adopted as the law of Florida and is at best persuasive only."  *Solitron Devices, Inc. v. Veeco Instruments, Inc.,* 492 So. 2d 1357, 1359 (Fla. 4th DCA 1986).  Section 670.204 says nothing whatsoever about limiting the loss of interest to the period preceding notification.  Instead, by its plain terms, the customer is "not entitled to interest from the bank on the amount to be refunded."  The use of the term "not" in that text is telling, as is the failure to qualify "interest" in any way.  The intent of the legislature

is paramount and that intent is to be taken from the ordinary meaning of the words the legislature chose to use. *See id.* at at 1359 (declining to conform a different UCC provision to an official comment because that construction would contradict the statute's plain language).[3]

Because section 670.240 does not limit the forfeiture of interest to any period, because the wording of the statute is stated in absolute terms, and because no Florida or other state court decision interpreting this provision holds otherwise, we conclude that the failure to satisfy the notice requirements bars any recovery of interest here. *See also In re Ludlum Enterprises, Inc.,* 510 F.2d 996, 999 (5th Cir. 1975) ("Our role in this case is to define state law [by] considering first, the wording of the statute itself; second, the title of the statute and the Florida Constitutional provision pertinent to the title; and third, the interpretation given to similar statutes in other states."); *Fla. Dept. of Children & Family Servs. v. P.E.,* 14 So. 3d 228, 234 (Fla. 2009) ("Legislative intent guides statutory analysis, and to discern that intent we must look first to the language of the statute and its plain meaning."); *Continental Cas. Co. v. Ryan, Inc. Eastern,* 974 So. 2d 368, 374 (Fla. 2008) ("legislative intent is determined primarily from the [statutory] text").

---

[3]       A federal district court in a diversity case is obligated to apply the law of that state as it would be applied by the highest court of that state or, absent such guidance, the court must follow an intermediate state appellate court "unless there is persuasive evidence that the highest state court would rule otherwise." *Bravo v. United States,* 577 F.3d 1324, 1326 (11th Cir. 2009); *see also Newberger v. United States Marshals Serv.,* 751 F.2d 1162, 1165 (11th Cir. 1985) ("the interpretations of Florida statutes by Florida courts, which have long experience in interpreting these statutes, are entitled to great weight in deciding what Florida law to apply.").

### III.   FINAL JUDGMENT

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

A.      Judgment is entered in favor of Plaintiff Roger A. Chavez, and against Defendant Mercantil Commercebank, N.A., as to the sole count of the Complaint.

B.      Plaintiff Roger A. Chavez shall recover THREE HUNDRED TWENTY NINE THOUSAND FIVE HUNDRED DOLLARS ($329,500.00) from Defendant Mercentil Commercebank, N.A., for which sum let execution issue, and for which post-judgment interest shall begin to accrue at the rate of 0.09 percent per annum pursuant to 28 U.S.C. § 1961.  No prejudgment interest shall be awarded.

C.      The Court reserves jurisdiction to enforce this Final Judgment and enter any other Orders or Judgments contemplated herein or address any matters timely raised by the parties in accordance with the Federal Rules of Civil Procedure.

D.      This case is now CLOSED.

**DONE AND ORDERED** in Chambers, Miami, Florida, this 23rd day of May, 2014.

EDWIN G. TORRES
United States Magistrate Judge